**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|   |   |   |
|---|---|---|
| DISH NETWORK L.L.C<br>and SLING TV L.L.C., | § § § § | CASE NUMBER 24 CV 11284 |
| Plaintiffs, | § § | **PLAINTIFFS' COMPLAINT** |
| RICHARD MOY<br>and CLVPN LLC, | § § § § | |
| Defendants. | § § | |

Plaintiffs DISH Network L.L.C. and Sling TV L.L.C. file this action against Defendants Richard Moy and CLVPN LLC, d/b/a City Lights Entertainment, for their violations of the Digital Millennium Copyright Act and Electronic Communications Privacy Act based upon Defendants' operation of illicit streaming services that capture and retransmit Plaintiffs' copyrighted television programming by circumventing Plaintiffs' security measures.

## PARTIES

1. Plaintiff DISH Network L.L.C. ("DISH") is a Colorado limited liability company having its principal place of business in Englewood, Colorado.

2. Plaintiff Sling TV L.L.C. ("Sling") is a Colorado limited liability company having its principal place of business in Englewood, Colorado.

3. Defendant Richard Alexander Moy ("Moy") is an individual that resides in Chicago Ridge, Illinois.

4. Defendant CLVPN LLC ("CLVPN") is an Illinois limited liability company having its principal place of business in Chicago Ridge, Illinois. Moy serves as sole manager of CLVPN. Moy authorized, directed, and participated in the infringing activities of CLVPN, which he uses to

1

process payments in connection with his television rebroadcasting scheme.

## JURISDICTION AND VENUE

5. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims for violations of the Digital Millennium Copyright Act, 17 U.S.C. § 1201 ("DMCA") and the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511, 2520 ("ECPA"). Halloween

6. The Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they each reside in Illinois and, through the wrongful conduct identified herein, purposefully directed their conduct towards and purposefully availed themselves of the privilege of conducting business in Illinois, causing injury to Plaintiffs in Illinois. The Court's exercise of personal jurisdiction over Defendants is reasonable and consistent with the constitution and laws of the United States.

7. The Court is an appropriate venue under 28 U.S.C. § 1391 because Defendants each reside in this judicial district and a substantial part of the events that give rise to Plaintiffs' claims occurred in this judicial district.

## DEFENDANTS' REBROADCASTING SCHEME

8. Plaintiffs provide television programming to several million authorized, fee-paying subscribers of their Sling TV and DISH Anywhere services by transmitting channels to them using the internet. Plaintiffs hold rights to transmit the channels pursuant to license agreements between DISH and programming providers. The programming aired on the channels is subject to copyright protections and Plaintiffs are authorized by the programming providers to protect them. Plaintiffs' channels, whether transmitted to Sling TV or DISH Anywhere subscribers, are delivered over the internet using the same Sling streaming platform ("Channels").

9. Plaintiffs implement digital rights management ("DRM") technology to protect the Channels from unauthorized access and copying. The DRM technology uses key-based subscriber

authentication and encryption-decryption processes to make the Channels accessible to authorized subscribers only and prevent unauthorized access to and copying of the Channels.

10. Moy operated an illicit streaming service under the name City Lights Entertainment ("Service"). Moy advertised that the Service was "USA based" and that he controlled the content transmitted on the Service, stating for example that he "find[s] sources" for content and provides "direct feed streams . . . [n]ot restreams like those overseas services." Moy also advertised that the Service was "top notch" because he had "the right amount of servers and load balancers" and spent a "good amount of money to have the very best structure that others don't."

11. Moy sold the Service directly to users and through a network of resellers. Resellers purchased subscriptions to the Service from Moy in bundles or panels and then resold them to their own users or sub-resellers. Resellers at times rebranded the Service using their own business name. Moy had control over and the ability to activate and deactivate Service subscriptions sold by his resellers. Moy claimed to have "over 500 sellers." And Plaintiffs were provided access to Moy's reseller panels showing there were more than 450,000 users of the Service.

12. Moy charged users $20 per month to access the Service when selling subscriptions to them directly. Moy charged resellers approximately $5 per monthly subscription to the Service, the price depending on factors such as the number of Service subscriptions the reseller purchased from Moy. Moy also claimed to sell channel streams to other service providers, stating for example that these other providers "buy my direct streams and restream them."

13. Moy received payments from his sale of the Service through means that included Venmo, Cash App, and PayPal accounts held in his name or under aliases such as "PapitoPatron" and "PapitoChacon." Moy also received payments from his sale of the Service using one or more accounts established in the name of his company, CLVPN, including a Venmo account associated

3

with City Lights Entertainment that had more than 1,700 payments. Moy instructed purchasers to disguise the purpose of their payments by claiming the payments were being sent to "Friends NOT [for] Services."



*Venmo Payment to Moy for Service Subscription*

14. Moy sold and supported the Service through Telegram. Moy's Telegram groups included Pale Moon Light, Standard Seller, and The Pride. Moy used the Pale Moon Light group to provide support for users of the Service, while the resellers were joined to other groups such as Standard Seller and The Pride based upon their volume of sales of the Service. Moy posted in these Telegram groups under the alias "Holmes" and the username @PapitoPatron.

15. Moy held himself out as a Chicago-area law enforcement officer when selling the Service, an example of which is shown in the images above where Moy associates himself with the "Chicago Police." Moy's resellers were informed that he was a law enforcement officer and that message was spread in the Telegram groups, including by group moderators working for Moy. On information and belief, Moy used his alleged association with law enforcement to market the Service to users and resellers and mitigate potential concerns over the unlawfulness of the Service.

16. Moy used the Telegram groups to communicate with his users and resellers about the content that was accessible on the Service, which included Moy taking requests for new content

to add to the Service and Moy troubleshooting issues with existing content that was not streaming properly on the Service. Moy claimed that he corrected issues involving content not streaming on the Service, at times within minutes or hours of the problem being reported to him.

17. Moy stated that his "wife" assisted him in operating the Service, in terms of adding subscriptions or "credits" to resellers' panels and adding content to the Service. Moy directed his resellers to be "specific on your requests for credits or content . . . because my wife also uses my [T]elegram to help." Moy instructed resellers to provide their "panel name, service . . . and how much you need" when purchasing subscriptions and "she can handle adding them." For adding content, Moy told resellers to provide links to "make it easier for her to plug in requests."

18. Moy used the Telegram groups to communicate to resellers instructions and tips to avoid being shut down for legal reasons, including Moy's rule that resellers could not display on social media any "videos or pictures of channel lineups of my service." Moy also directed resellers to avoid "red flag key words" such as "Tv Service . . . IPTV, Streams, Cable etc." Moy warned his resellers of legal actions involving other streaming services and advised resellers on how to acquire the customers of these services. Moy referred to himself and his resellers as "silent assassins."

19. Plaintiffs' Channels were transmitted without authorization to users of the Service. Identifiers that are unique to Plaintiffs' transmissions of the Channels were found when analyzing the corresponding channels on the Service, thereby confirming that channels transmitted to users of the Service originated from Plaintiffs. Sling's slates containing its distinctive logo, which appear for example on sports channels as a placeholder when an event is not being aired, were also located on channels transmitted on the Service, further showing Plaintiffs' transmissions were used to seed the Service with these Channels.



*Example Sling Slates Observed on the Service*

20. Plaintiffs' Channels were transmitted to users of the Service by circumventing the DRM technology that Plaintiffs use to protect the Channels from unauthorized access and copying. On information and belief, the circumvention targeted at least the Widevine DRM. The Widevine DRM controls access to the Channels by requiring Plaintiffs' subscriber to present a valid digital authentication key and license request to Sling's Widevine DRM server to obtain the decryption key required to unlock a particular Channel. The decryption key is sent to Plaintiffs' subscriber in an encrypted communication and upon receipt is not exposed to the subscriber but rather is secured in the content decryption module of the subscriber's Widevine supported device. The Widevine DRM also protects against copying of the Channels by requiring that the encrypted audio-visual segments that make up a Channel are unlocked using the decryption key and complied to form the Channel within the confines of the content decryption module, such that Plaintiffs' subscriber can only view the Channel and not transmit the Channel.

21. The Widevine DRM and the protection against copying that it affords is capable of being circumvented using a specially developed computer program that emulates the behavior of a reverse engineered hardware device. The computer program tricks Sling's Widevine DRM server to grant access and provide a decryption key by making the server believe the request originated

from a legitimate Widevine supported device that would keep the decryption key secured (though in reality the request came from a computer program mimicking the reverse engineered hardware). The computer program uses the decryption key to unlock the encrypted audio-visual segments that make up the Channel and then compiles the segments to form an unencrypted Channel capable of being copied and transmitted (as opposed to being merely viewed). The unencrypted Channel can be uploaded to a server outside of the Sling platform and transmitted to any number of users that can receive the Channel without purchasing a legitimate subscription from Plaintiffs.

22. On information and belief, users of the Service could receive Plaintiffs' Channels because the Widevine DRM used to protect the Channels from unauthorized access and copying was being circumvented as described above. Additional content offered on the Service is believed to have been acquired from other legitimate pay-television providers that use the Widevine DRM through this process of circumvention, which enabled the Service to offer thousands of channels and on-demand programs for a small fraction of the cost charged by legitimate providers that pay to license their content such as Plaintiffs.

## CLAIMS FOR RELIEF

### COUNT I

### Violations of the DMCA, 17 U.S.C. § 1201(a)(2)

23. Plaintiffs repeat and reallege the allegations in paragraphs 1-22.

24. Plaintiffs' DRM technology effectively controls access to the Channels, which are comprised of works protected under Title 17, United States Code. Plaintiffs are authorized by the copyright owners to control access to the Channels and use DRM technology with their consent.

25. Plaintiffs' DRM technology was circumvented to gain access to the Channels that were transmitted to users of the Service. On information and belief, the circumvention was targeted at Plaintiffs' Widevine DRM and represented an essential component or part of the Service.

26. The Service, or at least the component or part that involved gaining access to the Channels, was primarily designed and produced for circumventing Plaintiffs' DRM technology and had no commercially significant purpose or use other than circumventing such DRM technology.

27. Defendants violated 17 U.S.C. § 1201(a)(2) by manufacturing, offering the public, providing, or otherwise trafficking in the Service. Each sale of the Service constituted a separate violation of 17 U.S.C. § 1201(a)(2).

28. Defendants' actions that violated 17 U.S.C. § 1201(a)(2) were performed without the authorization or consent of Plaintiffs or, on information and belief, any owner of the copyrighted works provided by Plaintiffs.

29. Defendants' violations of 17 U.S.C. § 1201(a)(2) were willful. Such violations have damaged Plaintiffs in an amount to be proven at trial. Unless restrained and enjoined, Defendants will continue to violate 17 U.S.C. § 1201(a)(2).

## COUNT II
### Violations of the DMCA, 17 U.S.C. § 1201(b)(1)

30. Plaintiffs repeat and reallege the allegations in paragraphs 1-22.

31. Plaintiffs' DRM technology effectively controls copying of the Channels, which are comprised of works protected under Title 17, United States Code. Plaintiffs are authorized by the copyright owners to control copying of the Channels, including distribution and public performance through acts of transmission, and use DRM technology with their consent.

32. Plaintiffs' DRM technology provides protections against unauthorized copying that were circumvented to transmit the Channels to users of the Service. On information and belief, the circumvention was targeted at Plaintiffs' Widevine DRM and represented an essential component or part of the Service.

33. The Service, or at least the component or part that involved the transmission of the

Channels, was primarily designed and produced for circumventing the protections Plaintiffs' DRM technology provide against unauthorized copying and had no commercially significant purpose or use other than circumventing such protections.

34. Defendants violated 17 U.S.C. § 1201(b)(1) by manufacturing, offering the public, providing, or otherwise trafficking in the Service. Each sale of the Service constituted a separate violation of 17 U.S.C. § 1201(b)(1).

35. Defendants' actions that violated 17 U.S.C. § 1201(b)(1) were performed without the authorization or consent of Plaintiffs or, on information and belief, any owner of the copyrighted works provided by Plaintiffs.

36. Defendants' violations of 17 U.S.C. § 1201(b)(1) were willful. Such violations have damaged Plaintiffs in an amount to be proven at trial. Unless restrained and enjoined, Defendants will continue to violate 17 U.S.C. § 1201(b)(1).

## COUNT III
### Violations of the ECPA, 18 U.S.C. §§ 2511(1)(c)-(d), 2520(a)

37. Plaintiffs repeat and reallege the allegations in paragraphs 1-22.

38. The Channels transmitted on the Service are electronic communications that were intercepted from Plaintiffs to commit violations of the DMCA, ECPA, and other tortious acts.

39. Defendants intentionally disclosed and used the Channels through their operation of the Service, knowing or having reason to know the Channels were obtained through interception.

40. Defendants violated 18 U.S.C. §§ 2511(1)(c)-(d) and 2520(a) for tortious and illegal purposes, or for commercial advantage or private financial gain.

41. Defendants' violations of 18 U.S.C. §§ 2511(1)(c)-(d) and 2520(a) were intentional. Such violations have damaged Plaintiffs in an amount to be proven at trial. Unless further restrained and enjoined, Defendants will continue to violate 8 U.S.C. §§ 2511(1)(c)-(d) and 2520(a).

**PRAYER FOR RELIEF**

    A.    Defendants, and any officer, agent, servant, employee, or any other person acting in active concert or participation with them, should be permanently enjoined from:

    1.    manufacturing, offering to the public, providing, or otherwise trafficking in the Service, or any other technology, product, service, device, component, or part thereof that is primarily designed or produced, marketed for, or which has only limited commercially significant purpose or use other than, circumventing DRM technology or other technological measure that Plaintiffs use to control access to or protect against copying of a copyrighted work;

    2.    disclosing or using the Channels, or any other electronic communication of Plaintiffs if Defendants know or have reason to know that communication was intercepted.

Such injunctive relief is authorized by 17 U.S.C. § 1203(b)(1) and 18 U.S.C. § 2520(b)(2).

    B.    Plaintiffs should be awarded the greater of (1) their actual damages together with Defendants' profits that are attributable to the violations identified in Count I and Count II, or (2) statutory damages up to $2,500 for each violation identified in Count I or Count II, pursuant to 17 U.S.C. §§ 1203(c)(2) and (c)(3)(A);

    C.    Plaintiffs should be awarded the greater of (1) their actual damages together with Defendants' profits that are attributable to the violations identified in Count III, or (2) statutory damages of $100 for each day that Defendants were engaged in the violations identified in Count III or $10,000, whichever is greater, pursuant to 18 U.S.C. § 2520(c)(2);

    D.    Plaintiffs should be awarded punitive damages pursuant to 18 U.S.C. § 2520(b)(2);

    E.    Plaintiffs should be awarded their attorneys' fees and costs pursuant to 17 U.S.C. § 1203(b)(4)-(5) and 18 U.S.C. § 2520(b)(3);

    F.    Plaintiffs should be awarded pre- and post-judgment interest on all damages, from

the earliest date permitted by law at the maximum rate permitted by law;

    G.    Plaintiffs should be awarded any additional relief the Court deems appropriate.

Dated: November 1, 2024                        Respectfully submitted,

**LEWIN VERVENIOTIS LAW GROUP**

s/ David M. Lewin
David M. Lewin
120 North LaSalle Street, Suite 2600
Arlington Heights, Illinois 60602
Tel: (312) 725-2084
dml@lewver.com

**HAGAN NOLL & BOYLE LLC**
Timothy M. Frank (*pro hac vice* forthcoming)
820 Gessner, Suite 940
Houston, Texas 77024
Tel: (713) 343-0478
timothy.frank@hnbllc.com

*Attorneys for Plaintiffs DISH Network L.L.C. and Sling TV L.L.C.*